**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| DAN HAVEL, and | § | |
| DEAN RUCK, | § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-13-1291 |
| | § | |
| HONDA MOTOR EUROPE LTD., | § | |
| DENTSU MCGARRY BOWEN LLC, | § | |
| DENTSU MCGARRY BOWEN UK LTD., | § | |
| THE MILL (FACILITY) LIMITED, | § | |
| ROGUE FILMS LTD., AND DOES 1-3, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

In 2005, Houston artists Dan Havel and Dean Ruck used wooden house boards to create a

jagged, portal-like conical sculpture that drew the viewer from the front to the back of a house

located in the city's eclectic Montrose neighborhood.  The sculpture, entitled *Inversion*, has a

registered copyright.  *Inversion* was torn down later that year, but photographs—also

copyrighted—remain.  Havel and Ruck maintain a website featuring some of these photographs.

Roughly seven years after *Inversion*'s creation and destruction, employees at a London-based British

advertising agency stumbled on some of these images on the internet while working on a pitch to

present to Honda Motor Europe Ltd. (Honda Europe) to create a commercial for the European debut

of a CR-V model Honda vehicle.[1]  The advertising agency used the *Inversion* images in its final

presentation to Honda Europe and received the production contract.  The *Inversion* images played

---

[1] The Honda CR-V is a sport-utility-vehicle.

1

an increasingly prominent role in the production team's evolving concept of the Honda CR-V commercial. Presumably concerned about the copyright, the commercial's producer called Dean Ruck in Houston. The parties dispute the result of the phone and email communications that ensued. Ruck believed that the commercial might feature the general concept of a portal stretching through a wooden house structure but would not use *Inversion* images or anything too similar. The commercial's producer, on the other hand, believed that Ruck consented to the agency's use of his copyrighted material as long as the commercial did not use an actual image of *Inversion*.

The agency's production team used the photograph and built a replica of *Inversion* to use in filming the commercial. When Ruck learned that the advertising agency had built what was close to an *Inversion* replica, he promptly notified the agency that he disputed its right to do so. Ruck told the agency that it had misinformed him in the earlier call and emails. The producer and Ruck exchanged a few more emails but were unable to resolve their disagreement. The televison commercial began airing in Europe in October 2012.

Several months later, Ruck and Havel sued the London-based production company and the London-based advertising agency (along with several other foreign defendants, including Honda Europe) in Texas federal court, alleging copyright infringement and state-law fraud. The parties conducted jurisdictional discovery. The defendants moved to dismiss for lack of personal jurisdiction and *forum non conveniens*, (Docket Entry Nos. 28, 29), and the court heard oral argument.

Based on the pleadings, the motion, the briefs, the record, and the applicable law, the court denies in part and grants in part the defendants' motion to dismiss for lack of personal jurisdiction. The court denies the remaining defendants' motion for dismissal based on *forum non conveniens*.

2

The reasons are stated in detail below.

**I.     Background**

      **A.     Factual Background**

            **1.     The Parties**

                  **a.     The Plaintiffs**

Dan Havel and Dean Ruck live in Houston, Texas.  In 2005, they designed and built a wooden contemporary art sculpture entitled *Inversion*.  Havel and Ruck published the sculpture on May 1, 2005 in Houston, Texas.  *Inversion* is an original work that enjoys copyright protection under U.S. law.  *Inversion* is a sculpture made from wooden boards shaped into a portal-like conical structure leading from the front of a house to the back.  Boards of varying colors flare outward in varying lengths along the cone's periphery.  The cone is widest at the front of the house and tapers back, through the house, towards the cone tip.  (Docket Entry No. 26, Amended Compl. ¶ 17).

*Inversion* was removed from the site later in 2005 and no longer has a physical presence, the piece has persisted in images and renderings that are copyrighted.  Some of these images and renderings may be viewed on the internet.

                  **b.     The Defendants**

Honda Motor Europe Ltd. (Honda Europe), based in Slough, United Kingdom, is a wholly owned subsidiary of Honda Motor Company, Ltd., a Japanese parent corporation.  Honda Europe coordinates the import and distribution of Honda-trademarked products in Europe.  It purchases motor vehicles from separate Honda affiliates and distributes those vehicles through a European network of Honda subsidiaries and distributors, who in turn supply the vehicles to independent dealers.  (Docket Entry No. 28-3 ¶ 2).

Denstu McGarry Bowen LLC (McGarry Bowen US) and Dentsu McGarry Bowen UK Ltd. (McGarry Bowen UK) are distinct corporate entities that form part of a world-wide advertising parent organization known as the Dentsu Network.  (Docket Entry No. 28-6 ¶ 8).  McGarry Bowen US is a limited-liability company based in New York City with offices there and Chicago.  It provides advertising and marketing services to companies that sell goods and services, including the conception, development, and production of television, print, and digital advertisements.  (Docket Entry No. 28-5 ¶¶ 1-4).

McGarry Bowen UK is a corporation organized under United Kingdom law and based in London.  It provides advertising and marketing services to companies selling goods and services in Europe.  The services include the conception, development, and production of European television, print, and digital advertisements.  (Docket Entry No. 28-6 ¶¶ 3-4).

The Mill (Facility) Limited (The Mill UK), a United Kingdom corporation operating in London,  provides editing and digital effects in video services for the advertising, television, and film industries.  (Docket Entry No. 28-4 ¶¶ 3-4).

Rogue Films Ltd. (Rogue) is a London-based corporation organized under United Kingdom law.  Rogue provides film production services to advertising agencies and record companies in Europe.  (Docket Entry No. 28-9 ¶¶ 4-5).

### 2.      The Honda CR-V Commercial

#### a.      The initial prepitch collaboration between McGarry Bowen UK and McGarry Bowen US

In May 2012, Honda Europe invited McGarry Bowen UK to "pitch" a potential television advertisement for the Honda CR-V's European debut.  Jim Kelly, McGarry Bowen UK's chief executive officer in London, emailed Gorden Bowen, a McGarry Bowen founder who worked at

McGarry Bowen US in New York City.  Kelly Told Bowen that McGarry Bowen UK would "need help on this one" from McGarry Bowen US in New York because the new CR-V was already in the United States and "you are ahead of us."  (Docket Entry No. 37-5, at 2).  Bowen forwarded this email to Brandon Cooke, McGarry Bowen US's New York Managing Director.[2]  (*Id.*).  Cooke summarized an internal "Strategic Discussion" between the New York and London McGarry Bowen offices, copying six New York personnel (including Gordon Bowen), noting that "London and New York will share background and research," and stating that he would "work with London to define a clear and efficient process for sharing and approving of each key output of the pitch journey (strategy, creative ideas, campaign recommendations, presentation deck and team) with leadership in New York and London."  (Docket Entry No. 37-5, at 3).

By the end of May 2012, Alexandra Gardner, a Creative Director working in McGarry Bowen US's New York office, sent an email to McGarry Bowen US and UK managers, stating that she was "putting together and [sic] action plan for the Honda CR-V pitch."  (Docket Entry No. 37-5, at 5).  Gardner later distributed a list of the "McGarry Bowen Team," which included eleven New York employees (including eight Creative Directors) and five London employees.  (Docket Entry No. 37-5, at 9).

Once the pitch date became final, Stewart Owen, another McGarry Bowen US founder working in the New York office, wrote to a Managing Director in London that although he would not be joining the pitch because there needed to be a role for "you and for Gordon," he would "mak[e] sure that the work is in the right place and make[] sure that Brandon [Cooke] provides the

---

[2] Gordon Bowen also wrote Honda-UK's chief officer that "working with Honda Motors Europe would be one of the highlights of [his] career . . . ."  (Docket Entry No. 37-3, at 2).  If "given the opportunity," Bowen promised, he would "not fail you."  (*Id.*).

support to make it a killer presentation."  (Docket Entry No. 37-5, at 14).  Cooke directed the New

York team members on the storyline, casting, video quality, and editing work—all "key items that

[were] critical for [them] to get right or else Gordon [Bowen] would not want to use it for the pitch."

(Docket Entry No. 37-5, at 15; *see also id.* at 18 (directing the New York team "to uncover some

additional insight into our target and blow the Honda team away for our pitch")).

### b.        Developing the "Portal" Concept

As the pitch-development work unfolded, the McGarry Bowen UK creative team members

narrowed the concept to a portal evoking a sense of entering "another universe."  The creative team

envisioned several portal types using different materials, such as concrete, brick, or wood, with

different locations.  One of these portal concepts closely resembled Dan Havel and Dean Ruck's

*Inversion*, both in material (wooden boards) and style (long, conical, and with a trumpet-head like

opening).  According to the defendants, two McGarry Bowen UK employees, Remco Graham and

Richard Holmes, primarily originated and developed the portal idea, and "were at the center of all

creative decisions with regard to the idea."  (Docket Entry No. 28-6, ¶ 20).[3]  On June 14, 2012,

Graham downloaded and saved two *Inversion* images from Pinterest,[4] a website that allows its users

to "pin" what interests them onto virtual bulletin boards for others to see.[5]  (Docket Entry No. 37-7,

---

[3] The plaintiffs appear to dispute that these two individuals conceived the portal idea, but they offer no evidence to rebut the sworn declaration of McGarry Bowen UK's corporate officer. (Docket Entry No. 37, at 15).  The plaintiffs do, however, point to evidence showing that members of McGarry Bowen US's New York office also helped cultivate the portal concept, before and after the pitch.

[4] www.pinterest.com.

[5] Because Pinterest is a user-driven website that changes frequently, a record of the precise *Inversion* images that the advertisement teams discovered on the website is not available.  The plaintiffs contend that most of the *Inversion* Pinterest photos clearly indicate that the sculpture is copyrighted and based in Houston, Texas.  At the motion to dismiss stage, the court accepts this

at 4). Graham and Holmes placed these two *Inversion* images in a preliminary creative deck. One day later, on June 15, another McGarry Bowen UK employee emailed the deck to the McGarry Bowen US office in New York.

c.       **The Pitch**

On June 22, 2012, McGarry Bowen UK's creative team delivered the pitch in London. Several collaborating members of McGarry Bowen US were present. The pitch deck included two *Inversion* images, each with a Honda CR-V superimposed in front of the conical hole. (Docket Entry Nos. 37-3, at 21, 27; 37-7, at 4). Honda Europe awarded McGarry Bowen UK the advertising contract about a week later. Gordon Bowen of McGarry Bowen US sent the following email to the "Team," which included both the New York and London members:

> Team, You've done it! Honda, one of the biggest automotive brands in the world, has officially selected mcgarrybowen as its agency. I've been involved in many new business wins over the course of my career, but I am not sure I have ever witnessed a bigger "team" victory. This was truly a case of incredible talent within a global network coming together to WOW a client. Together we developed the right strategy, created a BIG, ORGANIZING idea, and proved to Honda that mcgarrybowen will be the agency that will take their brand into the ICONosphere.

(Docket Entry No. 37-3, at 30).

McGarry Bowen UK and Honda Europe negotiated and signed an agreement for producing the television advertisement for the European CR-V campaign. The contract authorized McGarry Bowen UK to hire its own production team and to retain McGarry Bowen US. McGarry Bowen UK subcontracted with Rogue Films to produce the television spot featuring *Inversion* and with The Mill UK to provide postproduction editing work.

---

factual allegation as true.

####    d.      Production

On July 17, 2012, Jim Kelly, McGarry Bowen UK's CEO, circulated an email entitled "Houston Hole house video" to five McGarry Bowen UK employees.  (Docket Entry No. 37-4, at 38).   The email contained a hyperlink to a video depiction of *Inversion* on the website www.arteryhouston.org.  (Docket Entry No. 37-6, at 17).  The www.arteryhouston.org website is administered by Artery Media Project, "a Houston based organization created to support the promotion of interdisciplinary works of art focusing on local Houston artists."  (Docket Entry No. 37-8, at 2).  According to the organization's founder, Mark Larsen, the link Kelly circulated in 2012 would have accessed a "video depicting the creation and final installation of Dan Havel and Dean Ruck's sculpture, *Inversion*."  (*Id.*).  The website "prominently displays a copyright notice on all of its pages, noting expressly 'all rights reserved,'" and the "website makes clear that we are based in Houston, including by providing our mapped Houston address and, of course, through use of the name of the website."  (*Id.*).  The next day, July 18, one of the McGarry Bowen UK recipients (Helen Whiteley) forwarded the email with the hyperlink to James Howland at Rogue Films. Howland forwarded the email to a Rogue colleague and to The Mill UK's Matthew Williams, who circulated it to his company's support staff.  (Docket Entry No. 37-6, at 17).

Before filming, McGarry Bowen UK consulted closely with the film's director, Sam Brown of Rogue.  On July 21, 2012, Brown presented his "Director's Treatment" to McGarry Bowen UK and sent it to Honda Europe.  The Treatment included two *Inversion* photos.  (Docket Entry No. 37-2, at 2).  In this presentation, Brown said the following about the portal concept:

> It's important that we consider the personality of this portal. . . . In looking at the picture references I felt a much warmer response to the wooden portal than the brick one, which felt a little cold and trap-like.  Graphically, it works much better that the wooden boards run invitingly towards the hole.  The whiteness of the wood helps to

8

offset the darkness of the hole itself.  I also like the idea that it's a home instead of an industrial/corporate building:  again, it brings a much-needed warmth to the portal. . . . The portal would not only suck back deeply into itself . . . beautiful shards of wood could also splay dramatically outwards like the house in your references.

(Docket Entry No. 37-6, at 6).  Honda quickly approved the Treatment.  (Docket Entry No. 37-3, at 36).

### e.    Communications with the Plaintiffs

Roughly one week later, on August 1, 2012, Rogue Producer Kate Hitchings contacted Dean Ruck in Houston to discuss the copyright issues of using images resembling *Inversion* in the commercial.  According to Rusk, Hitchings asked whether Rogue could use a portal through a wooden house in an advertising campaign for Honda.  (Docket Entry No. 37-4, at 55).  Ruck asked to see a mockup of the advertisement.  Later that afternoon, Hitchings sent over what she represented to be Director "Sam [Brown's] treatment," stating that "we haven't designed our portal yet" and that she didn't know whether "Sam is preferring a location that lends itself to a wooden house."  (Docket Entry No. 37-1, at 2).

Despite the fact that Brown included two *Inversion* photos in his "Director's Treatment" presentation to McGarry Bowen UK just one week earlier, Hitching's attachment of Brown's "treatment" contained generic versions of conical mockups, none bearing any resemblance to *Inversion*.  Hitchings sent an email the following day to her colleagues at McGarry Bowen UK, stating that she had changed the actual version of the "Director's Treatment" by "removing picture references [of *Inversion*], highlighting the trumpet shape [from another image] and losing some description of how the wooden version may look."  (Docket Entry No. 37-4, at 55).

Based on Hitchings's assurances that the proposed advertisement would not copy *Inversion*, Ruck responded that he did not believe a generic portal created a copyright issue.  *See* First

Amended Complaint (Docket Entry No. 26, at ¶ 25; *see also* Docket Entry No. 37-1, at 19).  Ruck emailed his partner, Havel, stating that he did not think Rogue was asking to use images of *Inversion*, just the general idea "of a portal through a wood house."  (Docket Entry No. 37-1, at 18).  Ruck emailed Hitchings that he did not think he and Havel had "any grounds for objecting to the concept of a portal through a wood frame house structural" as long as there was no use of "actual images of our Inversion project in any way, digitally manipulated or otherwise."  (Docket Entry No. 28-6, Ex. A).  The email made clear that using actual images "in any way" would require addressing "copyright and/or credit."  (*Id.*).

The Rogue production team moved forward with constructing a wooden portal on the set in Vancouver, Canada.  Two of The Mill UK's effects artists, Adam Grint and Alex Hammond, traveled from London to Vancouver for the shoot.  (Docket Entry No. 28-4 ¶ 6).[6]  When Ruck learned about how closely the constructed portal at the CR-V commercial set in Vancouver, Canada resembled *Inversion*, he promptly complained to Hitchings and demanded that Rogue "cease and desist."[7]  (Defendants' Oral Argument PowePpoint Presentation, at 12).  Hitchings responded that she "underst[ood] [Ruck's] concern" but assured him that the finished film would be "purely influenced by [his] work and not plagiarised [sic]."  (Defendants' Oral Argument PowerPoint Presentation, at 13).  Hitchings later sent Ruck a website link containing the near-finished video.  (Docket Entry No. 26 ¶ 26).

On October 22, 2012, the date of the commercial's European debut, Hitchings emailed Ruck,

---

[6] The Mill UK performed post-production editing and digital effects in London.  (Docket Entry No. 28-9 ¶ 10).

[7] Ruck and Havel had seen pictures on Reddit, a website where registered community members can submit content for entertainment, social networking, or news purposes (among others).

asking whether he and Havel wanted to receive credit for their "inspiring" of the portal concept and offering a "goodwill gesture of $10,000." (Docket Entry No. 28-6, Ex. B). Ruck responded that he would take the offer "into consideration with counsel." (*Id.*). Pending a decision, "[i]n the meantime, the proper credit would be read as 'Inspired by *Inversion*, created by Dan Havel and Dean Ruck of Havel Ruck Projects' or to that effect." (*Id.*). Later that day, McGarry Bowen UK issued a press release promoting the new television advertisement. The promotion noted that it was "inspired by *Inversion*, created by Dan Havel and Dean Ruck of Havel Ruck Projects." (Docket Entry No. 41, at 60). According to the plaintiffs, "[t]he final advertisement depicted a Honda CR-V being driven into *Inversion*'s large opening" accompanied by Garrison Keillor's[8] voice-over narration. (Docket Entry No. 28-6, Ex. B).[9]

That same month, a McGarry Bowen employee placed the finished Honda CR-V advertisement on the www.mcgarrybowen.com website, which is used by both McGarry Bowen US and UK for "general marketing purposes, but is not 'interactive.'" (Docket Entry No. 37-10, at 9). "Any user may enter a direct URL to view location-based content" on the website "regardless of the user's current location." (*Id.*). The website is hosted on Amazon Web Services. (*Id.*). The advertisement has remained on the website since then. (*Id.*).

McGarry Bowen UK and Rogue Films also uploaded the commercial to Vimeo,[10] which allows third parties to share videos. (Docket Entry No. 28-6 ¶ 18; 28-9 ¶ 13). Rogue Films

---

[8] Garrison Keillor, of National Public Radio's "Little House on the Prairie," recorded the voice-over from Minnesota. (Docket Entry No. 28-6 ¶ 12).

[9] The court has seen the video, (Docket Entry No. 41, Ex. 13), and agrees the resemblance is striking.

[10] www.vimeo.com.

uploaded the advertisement to YouTube,[11] another video-sharing website, and to its own websites, www.roguefilms.co.uk and www.roguefilms.com.  (Docket Entry No. 28-9 ¶¶ 12-13).  The Mill UK posted the commercial on its own website.  (Docket Entry No. 28-4 ¶ 8).  One of The Mill UK's freelance artists posted (without authorization) "the making of" video on her personal website, www.anibalsantaella.com.  (*Id.*).

### B.    Procedural Background

In May 2013, the plaintiffs sued McGarry Bowen UK, McGarry Bowen US, Rogue Films, and several other defendants in the United States District Court for the Southern District of Texas, asserting copyright infringement under U.S. and U.K. law, as well as state-law fraud/misrepresentation.  (Docket Entry No. 1).  The defendants moved to dismiss, (Docket Entry Nos. 15, 16, 22), and the plaintiffs amended their complaint, mooting the defendants' motion.  (Docket Entry No. 26).  The amended complaint removed some defendants and added new ones, including The Mill UK and Honda Europe.  McGarry Bowen US, McGarry Bowen UK, and Rogue Films remained.  After targeted jurisdictional discovery, the defendants moved under Rule 12(b)(2) to dismiss the amended complaint based on lack of personal jurisdiction and *forum non conveniens*.  (Docket Entry Nos. 28, 29).  The plaintiffs responded, the defendants replied, and the court heard argument.[12]

## II.    The Defendants' Motion to Dismiss for Lack of Personal Jurisdiction

### A.    The Legal Standard for Personal Jurisdiction

---

[11] www.youtube.com.

[12] The plaintiffs moved under Rule 41 to dismiss three other defendants—Honda Motor Company Ltd., Honda of the U.K. Manufacturing Ltd., and the Mill Group, Inc.—without prejudice. The court granted the unopposed motion.  (Docket Entry Nos. 45, 46).

Under Federal Rule of Civil Procedure 12(b)(2), the "plaintiff bears the burden of establishing a district court's jurisdiction over a non-resident." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008).  A plaintiff must make a *prima facie* showing that the defendant is subject to personal jurisdiction; "[p]roof by a preponderance of the evidence is not required." *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990) (citing *D.J. Invs. Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 545–46 (5th Cir. 1985)).  At the motion stage, "uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor." *Id.*

"A federal court sitting in diversity may exercise personal jurisdiction over a non-resident defendant (1) as allowed under the state's long-arm statute; and (2) to the extent permitted by the Due Process Clause of the Fourteenth Amendment." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 398 (5th Cir. 2009).  The Texas long-arm statute extends to the limits of due process. *Id*.  To satisfy due process, the plaintiff must demonstrate "(1) that the non-resident purposefully availed himself of the benefits and protections of the forum state by establishing 'minimum contacts' with the state; and (2) that the exercise of jurisdiction does not offend 'traditional notions of fair play and substantial justice.'" *Johnston*, 523 F.3d at 609 (citation omitted).

"A defendant establishes minimum contacts with a state if 'the defendant's conduct and connection with the forum state are such that [he] should reasonably anticipate being haled into court there.'" *Nuovo Pignone, SpA v. Storman Asia M/V*, 310 F.3d 374, 379 (5th Cir. 2002) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)).  "There are two types of 'minimum contacts': those that give rise to specific personal jurisdiction and those that give rise to general personal jurisdiction." *Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001).  The plaintiffs in this case

13

do not argue general jurisdiction.  (Docket Entry No. 37, at 22).  The issue is specific jurisdiction.

Specific personal jurisdiction "is confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction.'" *Goodyear Dunlop Tires Operations*, *S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011) (citation omitted).  The question is "whether there was 'some act by which the defendant purposefully avail[ed] [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'"  *Id*. at 2854 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).  "For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State."  *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014).

A court considers two issues in deciding whether a defendant's suit-related conduct creates a sufficient relationship with the forum state.  *See id*. at 1122.  "First, the relationship must arise out of contacts that the 'defendant himself' creates with the forum State."  *Id*. (quoting *Burger King*, 471 U.S. at 475).  The limits imposed on a state's "adjudicative authority principally protect the liberty of the nonresident defendant—not the convenience of the plaintiff[] or third parties."  *Id*. (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–92 (1980)).  The Supreme Court has "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State."  *Id*. (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984)).  The "unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction."  *Id*.  "Put simply, however significant the plaintiff's contacts with the forum may be, those contacts cannot be 'decisive in determining whether the defendant's due process rights are violated.'"  *Id.

14

(quoting *Rush v. Savchuk*, 444 U.S. 320, 332 (1980)).

"Second, [the] 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* (citations omitted). A "plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.* "[A] defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties. But a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id.* at 1123. "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the random, fortuitous, or attenuated contacts he makes by interacting with other persons affiliated with the State." *Id.* (quotation omitted); *see AllChem Performance Prods., Inc. v. Aqualine Warehouse, LLC*, 878 F. Supp. 2d 779, 787 (S.D. Tex. 2013) ("[S]pecific jurisdiction may not be based on the mere fortuity that a plaintiff is a Texas resident").

## B.   Application

Personal jurisdiction must be assessed on an individual-defendant basis. *See Rush v. Savchuk*, 444 U.S. 320, 332 (1980) ("The requirements of *International Shoe* . . . must be met as to each defendant over whom a state court exercises jurisdiction."). The court considers each defendant in turn.

### 1.   Rogue Films

Accepting the plaintiffs' well-pleaded allegations, Sam Bowen and Kate Hitchings—two production workers hired by Rogue—played an active role in infringing the plaintiffs' copyrights and defrauding the plaintiffs into consenting to Rogue's use of their copyrighted material in the CR-

V commercial.  Sam Bowen, the commercial's director, knew that *Inversion* was protected by copyright belonging to the Houston-native plaintiffs.  Bowen nonetheless prominently featured copyrighted pictures of *Inversion* in his "Director's Treatment" used to finalize the commercial and to produce it in Vancouver.  (Docket Entry No. 37-6, at 6) (envisioning that "beautiful shards of wood could also splay dramatically outwards *like the house in your references*." (emphasis added)).

Kate Hitchings, the commercial's producer, had even stronger connections to the plaintiffs and Houston.  Hitchings knew that the plaintiffs had created *Inversion* and had it copyrighted.  The photographs and images on the internet were clearly copyrighted.  Hitchings initiated the contact with Ruck in Houston, Texas via phone and email to secure his consent to the defendants' use of the concept and images.  When Ruck asked to see the images to determine whether they would be infringing, Hitchings sent what she represented as Director Bowen's "treatment," which she altered to omit the *Inversion* images.  Hitchings explained in emails she sent to McGarry Bowen UK saying that she had "remov[ed] picture references [of *Inversion*], highlighting the trumpet shape [from another image] and losing some description of how the wooden version may look."  (Docket Entry No. 37-4, at 39).  When Ruck saw pictures of the production set and told Hitchings that it too closely resembled *Inversion*, Hitchings emailed him multiple times, once to assuage his concerns when he asked her to "cease and desist," once to share a near-final version of the commercial, and a third time to ask how to credit Ruck and offering $10,000 in "goodwill."

The defendants argue that the Supreme Court's recent decision in *Walden v. Fiore*, 134 S. Ct. 1115 (2014), prevents this court's exercise of personal jurisdiction.  That case is distinguishable.  Unlike the defendant in *Walden*, nothing about Hitchings's contacts with Ruck and Houston was "random, fortuitous, or attenuated," *id.* at 1123.  As another court has recently observed:

In *Walden*, the officer was stationed at the Atlanta airport, and seized a bag that
could have been headed anywhere. The officer's purpose was to investigate potential
criminal activity occurring in the Atlanta airport, regardless of the origin or
destination of any evidence or person he investigated.   The officer did not
purposefully target Nevada or any Nevada citizen, nor did he intend for any action
taken at the Atlanta airport to have consequences in Nevada.   That consequences
occurred in Nevada was, as the Supreme Court stated, random and attenuated to the
defendant officer's action in Georgia.

*Allianz Global Corporate & Specialty v. Advantage Aviation Techs., Inc.*, — F. Supp. 2d —, No.

13-cv-14439, 2014 WL 3586556, at *6 (E.D. Mich. July 22, 2014).  Here, by contrast, Hitchings

purposefully targeted the plaintiffs and their protected intellectual property in Houston, Texas, by

unsolicited contacts via phone and email.[13]  And, by contrast, Hitchings intended her action to have

the consequences in Texas that the plaintiffs would not interfere with the defendants' completion

of the commercial using the plaintiffs' copyrighted work.

The defendants argue that because "copyright infringement claims arise out of the

distribution of the copyrighted [works]," *Collins v. Doe*, No. H-10-2882, 2010 WL 1414246, *5

(S.D. Tex. Apr. 23, 2010), and the distribution here occurred only in Europe, these contacts cannot

support personal jurisdiction under *Walden* and *Calder*.   Although the connection between a

defendant's suit-related conduct and the forum state will clearly be strongest when that conduct

forms one of the elements of the intentional tort alleged—for example, for a libel claim, the

publication of false material in the forum state—*Walden* and *Calder* do not limit "suit-related

---

[13] For similar reasons, this case is different from the Fifth Circuit's recent application of
*Walden* in *Monkton Insurance Services, Ltd. v. Ritter*, — F.3d — , 2014 WL 4799716 (5th Cir. Sept.
26, 2014).  The defendant "entered into an account contract with . . . a Cayman company, in
Cayman, not with Ritter, a Texas resident." *Id.* at *4.  The defendant could "not be said to have *sent
anything to Texas*" and the "communications between [the Texas plaintiff] and [the defendant] and
the wire transfers facilitated by [the defendant] were *initiated by Ritter* [the Texas plaintiff] or [the
Cayman company]" and were "insufficient to confer jurisdiction." *Id.* (citing *Walden*, 134 S. Ct.
at 1122) (emphasis added).

conduct" to the *elements* of a tort.  *See Walden*, 134 S. Ct. at 1123-24 (recognizing that [t]he strength

of that connection" in *Calder* between the defendants and California "was largely a function of the

nature of the libel tort" but observing that "various facts . . . gave the [libelous] article a California

focus," including "phone calls to 'California sources' for the information in their article" about "the

plaintiff's activities in California").

Even assuming the defendants' interpretation is correct, the plaintiffs' have plausibly alleged

a state-law claim of fraud or misrepresentation that clearly arises out of Hitchings's phone call and

emails directed to Texas.  The defendants argue that Ruck's discovery of the defendants' use of

*Inversion* before the commercial debuted defeats any claim based on Hitching's deception because

Ruck could not have detrimentally relied on them after that point.  But Ruck relied on Hitching's

misrepresentation of the extent to which the commercial appropriated *Inversion* in concluding that

he had no authority to stop them from proceeding before they completed planning and building the

set to film the commercial.  Ruck relied on the misrepresentation when he told Hitchings to go ahead

with the generic portal/wooden house plans.  Once the defendants had built the set to produce the

commercial, they decided to proceed because of the amount spent.  Ruck sent Hitchings an email

demanding a "cease and desist," without effect.  (Defendants' Oral Argument Powerpoint

Presentation, at 12).  That Ruck might have tried to do more later does not diminish Hitchings's

earlier misrepresentations.  (*See* Docket Entry No. 26 ¶ 36) (alleging that "Havel and Ruck relied

on the false representations or nondisclosures to a material degree, including by losing any ability

to demand payment in advance for the use of their copyrighted work, and because they were induced

by fraud to forbear taking legal remedies and seeking an injunction prior to the airing of the

commercial")).

Rogue's "suit-related conduct" created "a substantial connection with" Texas. Exercising jurisdiction does not offend traditional notions of fair play and substantial justice.[14] *Walden*, 134 S. Ct. at 1123-24. Rogue's motion to dismiss for lack of personal jurisdiction is denied.

### 2.    McGarry Bowen UK

The plaintiffs allege that McGarry Bowen UK was involved in the portal concept from start to finish. The plaintiffs' allegations raise a plausible inference that McGarry Bowen UK and its employees had a front-row seat to, and at times an active role in, appropriating *Inversion*, a copyrighted Houston-based sculpture, from Houston-based artists. McGarry Bowen UK's creative-team members discovered *Inversion* images (which were necessarily taken in Houston) on Pinterest, added *Inversion* images with superimposed Honda CR-Vs to their pitchbook, and included *Inversion* images in their final presentation to Honda Europe. Many images of *Inversion* credit the sculpture's artists and location, and carry copyright notices. The plaintiffs plausibly allege that McGarry Bowen UK employees knew the Houston location of the sculpture and its creators throughout.

Viewed in isolation, these contacts are too "random, fortuitous, or attenuated" to satisfy due process because they stemmed more from Ruck and Havel's (and *Inversion*'s) connection to Houston than they did from McGarry Bowen UK's own activities connected to Texas. *Walden*, 134 S. Ct. at 1123 (quotation omitted). But when viewed alongside McGarry Bowen UK's subsequent acts connecting them to Houston, Texas and to the intellectual property created and displayed there, "not just to a plaintiff who lived there," these contacts are enough. *See Walden*, 134 S. Ct. at 1124.

---

[14] None of the defendants argues that even if minimum contacts exist, exercising jurisdiction would offend traditional notions of fair play and substantial justice. Exercising jurisdiction over a company that may have been complicit in an intentional tort directed at plaintiffs in Texas does not offend fair play and substantial justice.

After the successful pitch and during the development process, but before the set was built, McGarry Bowen UK's CEO, Jim Kelly, circulated an email to five members of the creative team entitled "*Houston* Hole house video." (Docket Entry No. 37-4, at 38) (emphasis added). Helen Whiteley, one of the McGarry Bowen UK recipients, forwarded the email to the production team working on the commercial. The email included a link to a video on www.arteryhouston.org, a Houston-based website with Houston-based servers that promotes Houston-based artwork. Artery's founder and principal, Mark Larsen, provided a sworn declaration, attached to plaintiffs' response, in which he states that the website at that time would have displayed a video demonstrating how the plaintiffs constructed *Inversion* in Houston. (Docket Entry No. 37-8).

Larsen's sworn declaration also states that the *Inversion* video on the Artery Houston website prominently displayed a copyright notice. (Docket Entry No. 37-8 ¶ 2). The website made it clear that *Inversion* and its creators were firmly tied to Houston. (*See* Docket Entry No. 37-8, at 3). Although no defendant admits clicking the link or watching the video, or using the video to build the set in Vancouver, they are reasonable inferences under Rule 12(b)(2).

Even if the above contacts are not sufficient, they surely are enough when paired with internal emails suggesting that McGarry Bowen UK executives knew of and condoned, or actively supported, Hitchings's deceptive phone call with and emails to Houston to obtain permission from Houston residents Dean Ruck and Dan Havel to use the design and images of their Houston sculpture, *Inversion*. As noted above, Hitchings sent an email to Helen Whiteley at McGarry Bowen UK about the call she placed to Houston. Hitchings acknowledged that in the call, she "[c]ame at it *as though* [she] was *doing this alone*"—that is, "as though" she was not working with McGarry Bowen US and McGarry Bowen UK. (Docket Entry No. 37-4, at 55) (emphasis added). Hitchings

wrote Whitely that she had "sent [Ruck] a tweaked treatment—see attached, removing [*Inversion*] picture references, highlighting the trumpet shape [of another image] and losing some description of how the wooden version may look." (*Id.*).  Hitchings wrote that she was "hoping he reads this [tweaked treatment] first and is encouraged we never set out to copy his work." (*Id.*).  Whiteley forwarded Hitchings's email to her colleagues at McGarry Bowen UK (including its chairman, Simon North) under the subject heading "preliminary overture to the *Houston house people*." (*Id.*) (emphasis added).  North's response:  "Let's keep 'em crossed." (*Id.*).

McGarry Bowen UK put the completed commercial on its own website (www.mcgarrybowen.com) for "general marketing purposes," and on Vimeo, a globally popular video-sharing site, knowing that it copied Ruck and Havel's copyrighted Houston sculpture design and that Texans would be among those able to access the video on the websites.   Although a "passive website, one that merely allows the owner to post information on the internet . . . will not be sufficient to establish personal jurisdiction," *Revell v. Lidov*, 317 F.3d 467, 470 (5th Cir. 2002) (quotations omitted), it is a relevant factor.  *Cf. McZeal v. Fastmobile, Inc.*, 2006 WL 801175 (S.D. Tex. 2006), *judgment aff'd*, 219 Fed. Appx. 988 (Fed. Cir. 2007) (holding that there was no jurisdiction over a defendant in a trademark infringement action based on forum contacts limited to responding to unsolicited correspondence and operating a passive website (emphasis added))

McGarry Bowen UK's "suit-related conduct" created "a substantial connection with" Texas, such that exercising jurisdiction does not offend traditional notions of fair play and substantial justice.  The court denies McGarry Bowen's motion to dismiss for lack of personal jurisdiction.

### 3.    McGarry Bowen US

Although the portal idea appears to have originated with McGarry Bowen UK's creative

team, McGarry Bowen US employees and other defendants played a role in developing this concept as the pitch evolved.  On June 15, just one day after McGarry Bowen UK employees downloaded the *Inversion* images from Pinterest and placed them in the preliminary creative deck, Alex McNamara of McGarry Bowen UK emailed the deck to three McGarry Bowen US employees in New York.  (Docket Entry No. 37-7, at 4; 37-3, at 10).  On June 17, 2012, someone at McGarry Bowen UK circulated an internal email saying that "Rich and Rem"—who the defendants contend came up with the portal concept and discovered the *Inversion* images—had to "rework[] following Gordon[ Bowen]'s comments."  (Docket Entry No. 37-3, at 8).  That same email had five attachments, four of which were ".png" files—that is, images—with "portal" in the title.  (*Id.*).  Gordon Bowen of McGarry Bowen US rejected one specific manifestation of the portal concept—driving through an open door—because it too closely resembled a copyrighted advertisement for another vehicle.  He also personally emailed Honda Europe executives about McGarry Bowen UK's pitch proposal:

> Portals. You will see that every piece of our campaign is unified around a portal or transformative gateway. These are used in movies and literature from Harry Potter and Alice in Wonderland through Stargate and The Matrix. As far as we know, they haven't been used as a key campaign device in advertising, and yet they are the perfect metaphor for our target audience to experience the liberation and exploration that they crave at this time of their lives. The portal device is very in tune with "Power of Dreams" and you will see that the CR-V is the enabling vehicle which bestows the gift to our drivers to follow their own dreams.

(Docket Entry No. 37-2, at 4).

After Honda awarded McGarry Bowen UK the advertising contract, Gordon Bowen remained involved.  Bowen wrote Honda Europe's CEO, "assur[ing]" him of his "attention at all times" and emphasizing that "if you have any concerns about the team or the program at any point I want to hear them personally."  (Docket Entry No. 37-5, at 31).  He emailed McGarry Bowen UK's

22

CEO Jim Kelly, telling him, "[y]ou need to get the creative in front of new york [McGarry Bowen US] right now." (Docket Entry No. 37-5, at 28). He worked on Honda's proposed changes to the campaign, and gave his reactions to McGarry Bowen UK's work, the budget, the film director selection, and gave detailed suggestions on later versions of the work. (Docket Entry Nos. 37-3, at 37; 37-5, at 27, 29-30). In September 2012, two McGarry Bowen UK employees sent Gordon Bowen an email with a link to show him "where we are with the CR-V film." (Docket Entry No. 37-3, at 37). Bowen responded that he thought it was "much better" and provided feedback on several aspects. (*Id.*). In early October, Bowen sent an email entitled "Fw: CR-V" to McGarry Bowen UK CEO Jim Kelly. Bowen wrote, "[w]hether the Japanese like it or not I would like a new ending line written for the launch spot that we record with a different voice per previous specs." (Docket Entry No. 37-3, at 39). Even the defendants acknowledge that "Mr. Bowen was occasionally consulted for general feedback as McGarry Bowen UK produced the advertisement." (Docket Entry No. 41, at 64). The record shows that Bowen was asked for and provided more.

The plaintiffs argue that Bowen's involvement in developing the portal concept and monitoring the project from its pre-*Inversion* start to post-*Inversion* (and allegedly infringing) finish supports jurisdiction. Even taking those allegations as true, however, the plaintiffs do not allege—and jurisdictional discovery does not support an inference—that Bowen directed activity towards Texas, either by himself or with McGarry Bowen UK. Unlike the executives at McGarry Bowen UK, the record and the pleadings suggest that Bowen knew that: *Inversion* was based in Houston; *Inversion*'s copyrights belonged to Havel and Ruck; or others working on the commercial made efforts to obtain the copyright holders' permission to use *Inversion*. Without allegations or evidence connecting Bowen's (or his US-based employees') "conduct to [*Texas*]," as opposed to

23

"plaintiff[s] who lived there," McGarry Bowen US's own contacts with Texas are too "random, fortuitous, or attenuated" to satisfy due process. *Walden*, 134 S. Ct. at 1123-24 (quotation omitted).

The plaintiffs alternatively argue that this court should ignore the corporate formalities between McGarry Bowen US and McGarry Bowen UK and "fuse the two together for jurisdictional purposes." *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 346 (5th Cir. 2004) (quoting *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983)).  "As a general rule . . . the proper exercise of personal jurisdiction over a nonresident corporation may not be based solely upon the contacts with the forum state of another corporate entity with which the defendant may be affiliated." *Id.* at 346.  "In determining whether a plaintiff asserting personal jurisdiction has overcome the presumption of corporate separateness, [a] Court considers the following nonexhaustive factors: (1) the amount of stock owned by the parent of the subsidiary; (2) whether the entities have separate headquarters, directors, and officers; (3) whether corporate formalities are observed; (4) whether the entities maintain separate accounting systems; and (5) whether the parent exercises complete control over the subsidiary's general policies or daily activities." *Id.* (citing *Hargrave*, 710 F.2d at 1159).  McGarry Bowen US and McGarry Bowen UK have separate officers and directors, observe corporate formalities, and do not own or control one another.  (Docket Entry No. 41, Ex. 6 §§ 7-8).  The plaintiffs have not met their burden to rebut "the presumption of institutional independence of related corporate entities" by "clear evidence." *Freudensprung*, 379 F.3d at 346 (quotation omitted).

The court grants McGarry Bowen US's motion to dismiss for lack of personal jurisdiction.

### 4.    The Mill UK

The Mill UK's employees helped build the *Inversion*-like structure in Vancouver and

provided post-production services in London.  They also received a forwarded hyperlink to the www.arteryhouston.org video showing the creation of *Inversion.*  The subject line was "Houston Hole house video."  (Docket Entry No. 37-6, at 17).  McGarry Bowen UK CEO Jim Kelly circulated the hyperlink to McGarry Bowen UK employees.  Helen Whiteley in turn forwarded the link to Rogue Films employees, who forwarded it to Matthew Williams at The Mill UK.  (*Id.*).  Williams forwarded the same email—including the subject line—with the same link to four members of The Mill UK's staff.  (Docket Entry No. 37-6, at 21).  Watching the video makes the copyright protection for the Houston-based work clearer.

But this is not enough.  The Mill UK's employees may have been on notice that they were potentially causing injury in Texas, but their "suit-related conduct" was focused more toward the plaintiffs than toward the forum state.  Unlike Rogue and McGarry Bowen UK, there is no evidence that The Mill UK's employees knew of, participated in, or condoned Hitchings's allegedly fraudulent communications with the Houston-based plaintiffs, in Houston, to wrongfully obtain permission to use their copyrighted material.

Nor is the company's posting of the commercial on its website enough to establish personal jurisdiction.  As the Fifth Circuit has explained, a "passive website, one that merely allows the owner to post information on the internet . . . will not be sufficient to establish personal jurisdiction." *Revell v. Lidov*, 317 F.3d 467, 470 (5th Cir. 2002) (quotation omitted).  The Mill UK's website is passive.  And because the company only seeks customers in the United Kingdom, it did not "direct[]" its website posting at Texas residents.

The court concludes that exercising personal jurisdiction over The Mill UK would offend due process under *Walden*.  The Mill UK's motion to dismiss for lack of personal jurisdiction is

granted.

### 4.    Honda Europe

The plaintiffs argue that McGarry Bowen UK's contacts may be imputed to Honda Europe under a corporate agency theory.  Some courts have treated agency theories of personal jurisdiction as separate from alter-ego theories.  *See Maurice Pierce & Assocs.*, 608 F. Supp. 173, 176 (N.D. Tex. 1985) ("Two theories have been employed by the courts in determining whether the business activities of one corporate entity may be imputed to a related corporate entity for purposes of personal jurisdiction.  These theories are (1) the agency theory and (2) the control or the alter ego theory." (citations omitted)).[15]  The Supreme Court recently confirmed that "[a]gency relationships . . . may be relevant to the existence of specific jurisdiction."  *Daimler AG v. Bauman*, 134 S. Ct. 746, 759 n.13 (2014) (emphasis omitted).

"As such, a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there."  *Id.* (citing *Asahi*, 480 U.S. at 112 (opinion of O'Connor, J.) (defendant's act of "marketing [a] product through a distributor who has agreed to serve as the sales agent in the forum State" may amount to purposeful availment); *International Shoe*, 326 U.S. at 318 ("the commission of some single or occasional acts of the corporate agent in a state" may sometimes

_____

[15] It is unclear whether the Fifth Circuit uses the *Hargrave* factors in analyzing those two theories of personal jurisdiction.  *See Freudensprung*, 379 F.3d at 346 (noting that "our cases generally . . . demand proof of control [by one corporation] over the internal affairs of another corporation to make the other its agent or alter ego" before stating that the *Hargrave* factors are the appropriate test to "overcome the presumption of corporate separateness"); see also *O'Quinn v. World Indus. Const.*, 68 F.3d 471 (5th Cir. 1995) (unpublished) ("According to well-established law, a defendant may be found subject to personal jurisdiction as a result of the actions of an agent. . . . [I]n order for a principal-agent relationship to be established, the principal must have the right to control both the means and details of the process by which the agent accomplishes the actions at issue.").

"be deemed sufficient to render the corporation liable to suit" on related claims)).   "Under Texas

law, an agency relationship must  be affirmatively established[;] it may not be presumed." *Coffey*

*v. Fort Wayne Pools, Inc.*, 24 F. Supp.2d 671, 677 (N.D. Tex. 1998) (citations omitted).  An agency

relationship requires "evidence from which the court could conclude that [t]he alleged principal

[had] the right to control both the means and details of the process by which the alleged agent [was]

to accomplish the task." *Id.*

The plaintiffs point to the "Agency Agreement" that the two companies negotiated and

signed after Honda Europe selected McGarry Bowen UK to produce the CR-V commercial.  The

plaintiffs cite several provisions of the Agreement, including the following:

### 3. APPOINTMENT OF AGENCY
3.1 The Client [Honda UK] hereby appoints the Agency [McGarry Bowen UK] to
carry out and the Agency agrees to provide the Services to the Client on the terms set
out in this Agreement.

Agency Agreement § 3.1 (Docket Entry No. 37-3, at 44).

The plaintiffs contend that this clause "appoint[ed]" McGarry Bowen UK as Honda Europe's

"[a]gen[t]."  But as the defendants point out, the plaintiffs' argument relies too heavily on the use of

the word "agency" without recognizing that the context is a contract with an advertising *agency*.

Properly read, the word "agency" in the agreement merely refers to McGarry Bowen UK, the

"advertising agency," and does not create an agency role for McGarry Bowen UK with Honda

Europe as the principal.

Considering the Agreement's other provisions, however, makes it clear that Honda Europe

had the right to control both the means and details of the process by which McGarry Bowen UK was

to accomplish its work.  Section 11 of the Agreement required McGarry Bowen UK to obtain

"written approval" from one of four "Authorised Person[s]" at Honda Europe to receive funding and

before completing many tasks.  Agency Agreement § 11.1.  Section 11.3 requires the "Agency" to obtain written approval for the campaign's overall budget as well as for specific expenditures on copy, layouts, artwork, storyboards, scripts, and various advertising items.  *See id.* §§ 11.3.1-2. Without such approval, the Agency would lack authorization to "purchase production materials and prepare proofs," "publish," "enter into production contracts and engage performers," or "transmit" films and recordings.  *Id.* §§ 11.4-5.  While the Agency could appoint "suppliers" and negotiate the "terms and conditions of such appointment," on Honda Europe's request, the "Agency *shall* obtain more than one quote for a particular supply and discuss these with [Honda Europe] before placing an order."  *Id.* § 14.1 (emphasis added).

The Agreement required McGarry Bowen UK to "obtain all usage rights in Existing Material and Commissioned Material as are deemed necessary by the Agency at the time such material is selected or obtained," *id.* § 18.2 (Docket Entry No. 37-3, at 51).  This duty was conditioned on McGarry Bowen UK warranting that its work product did not "infringe the Rights of any third party," *id.* § 22.1.2, "include any material copied wholly or in part from any third party copyright work," *id.* § 22.3.2, and did not "infringe any copyright anywhere in the world which belongs to any third party," *id.* § 22.3.4.  The Agreement also required McGarry Bowen UK to indemnify Honda against infringement claims and to obtain indemnity insurance.  *See id* §§ 20, 22.5. (Docket Entry No. 37-3, at 54, 56-57).  McGarry Bowen viewed two Honda employees as "running the show."  (Docket Entry No. 37-3, at 37).  Honda sent representatives to oversee the filming in Vancouver and approve it.

Despite these allegations and evidence, the plaintiffs may not impute McGarry Bowen UK's contacts to Honda Europe in this case because Honda Europe never directed McGarry Bowen UK to "take action" with respect to the State of Texas.  *Bauman*, 134 S. Ct. at 759 n.13.  Apart from

Honda Europe's approval of the ad campaign and monitoring of the production process—both of which necessarily involved overseeing the use of *Inversion* images and the construction of the replica—the plaintiffs have not alleged or shown how Honda Europe "direct[ed] its agents or distributors to take action" with respect to Houston, Texas.  The plaintiffs do not allege or point to any evidence that Honda Europe played any role in contacting them by phone or email and misrepresenting the ad campaign to obtain their consent to the ad design and contents.  The plaintiffs do not meet the burden necessary to impute McGarry Bowen UK's contacts to Honda Europe.  Nor have they shown that Honda Europe itself had minimum contacts with Texas as needed for personal jurisdiction.  The court grants Honda Europe's motion to dismiss for lack of personal jurisdiction.

In summary, the court grants the motion to dismiss for lack of personal jurisdiction as to defendants McGarry Bowen US, The Mill UK, and Honda Europe, and denies the motion as to defendants Rogue Films and McGarry Bowen UK.  The issue as to the remaining defendants is *forum non conveniens*.

### III.    The Defendants' Motion to Dismiss for Forum Non Conveniens

#### A.    The Legal Standard for Forum Non Conveniens

"The principle of *forum non conveniens* is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute."  *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947).  "A court's authority to effect foreign transfers through the doctrine of *forum non conveniens* 'derives from the court's inherent power, under Article III of the Constitution, to control the administration of the litigation before it and to prevent its process from becoming an instrument of abuse, injustice, or oppression.'"  *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 828 (5th Cir. 1993) (citation omitted).  "When an alternative forum has jurisdiction

to hear the case and when trial in the plaintiff's chosen forum would 'establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience,' or when the 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems,' the court may, in exercise of its sound discretion, dismiss the case.'" *Kempe v. Ocean Drilling & Exploration Co.*, 876 F.2d 1138, 1141 (5th Cir. 1989) (quoting *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947)).

"[A] forum non convieniens dismissal must be based on the [court's] finding that, when weighed against plaintiff's choice of forum, the relevant public and private interests strongly favor a specific, adequate and available forum." *Verba-Chemie A.G. v. M/V Getafix*, 711 F.2d 1243, 1245 (5th Cir. 1983). The movant "bears the burden of invoking the doctrine and moving to dismiss in favor of a foreign forum." *In re Air Crash*, 821 F.2d 1147, 1164 (5th Cir. 1989). "This burden of persuasion runs to all the elements of the forum non conveniens analysis." *Id.* The defendants must "demonstrate (1) the existence of an available and adequate alternative forum and (2) that the balance of relevant private and public interest factors favors dismissal." *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 671 (5th Cir. 2003). "In addition to the balancing of relevant private interest factors, the court must give 'the relevant deference' to the plaintiff's choice of forum." *Alpine View Co. v. Atlas Copco AB,* 205 F.3d 208, 221–22 (5th Cir. 2000) (quoting *In re Air Crash*, 821 F.2d at 1165). To meet this relatively high burden, the remaining defendants "must supply the Court with enough information for it to conduct a meaningful inquiry and balance the parties' interests." *Blum v. Gen. Elec. Co.*, 547 F. Supp. 2d 717, 725 (W.D. Tex. 2008) (citing *Empresa Lineas Maritimas Argentinas, S.A. v. Schichau–Unterweser, A.G.*, 955 F.2d 368, 371 (5th Cir. 1992)).

"The *forum non conveniens* determination is committed to the sound discretion of the trial court.  It may be reversed only when there has been a clear abuse of discretion; where the court has considered all relevant public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference."  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981).

> ### B.    Application

> ### 1.    The Existence of an Available and Adequate Alternative Forum

The first issue is whether the UK is an available and adequate alternative forum.  The UK defendants whose suit-related conduct led to the alleged copyright infringement are amenable to process in the UK.  The defendants also argue that the UK provides an adequate forum for resolving the plaintiffs' copyright claims.  A sworn declaration from a British barrister specializing in intellectual property law attests to the method of service and types of remedies available under UK copyright law, (Docket Entry No. 28-8).  Because UK copyright law would apply to any infringing distribution in Europe under the Berne Convention, the defendants contend, a UK court would be both available and adequate to resolve the plaintiffs' claims. *See Intercontinental Dictionary Series v. De Gruyter*, 822 F. Supp. 662, 680 (C.D. Cal. 1993) ("[T]he unrefuted evidence submitted to the Court substantiates that a United States copyright would be given protection in Australia, since both parties are signatories to the Berne Convention.").  The defendants contend that the UK provides an available and adequate forum to resolve any additional claims of US copyright law violations.

Although the plaintiffs do not challenge the UK's adequacy as a forum, they respond that the UK is not, as a threshold matter, a suitable alternative forum because it fails to guarantee compulsory process for McGarry Bowen US, which is based in New York. *See Piper Aircraft*, 454

U.S. at 254-55 n. 22 ("At the outset of any *forum non conveniens* inquiry, the court must determine whether there exists an alternative forum. Ordinarily, this requirement will be satisfied when the defendant is 'amenable to process' in the other jurisdiction.").

The court concludes that the defendants have met their burden to show that the UK is an available and adequate forum to resolve the plaintiffs' dispute. The court has already dismissed McGarry Bowen US, the sole American defendant, for lack of personal jurisdiction. The remaining defendants—Rogue Films and McGarry Bowen UK—are "amenable to process" in the UK. (Docket Entry No. 29-8, at 4) (declaring that the three England-based defendants are "subject to the jurisdiction of the English courts and proceedings could be served on them without the permission of the Court"); *see also Tajik Aluminum Plant v. Hydro Aluminum AS* [2005] EWCA Civ 1218; [2006] 1 W.L.R. 767; [2005] 4 All E.R. 1232. The record shows that the plaintiffs' UK and US copyright claims may both be tried in the English courts, where similar remedies are available for both. (Docket Entry No. 29-8, at 2-3).

## 2.      The Private and Public Interest Factors

The defendants must also show that the balance of relevant private and public interest factors strongly favors dismissal. "Normally, there is a 'strong presumption in favor of the plaintiff's choice of forum that may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum.'" *Blum*, 547 F. Supp. 2d at 726 (quoting *Schexnider v. McDermott, Int'l, Inc.*, 817 F.2d 1159, 1163 (5th Cir. 1987)); *see also Tendeka, Inc. v. Glover*, No. H-13-1764, 2014 WL 978308, at *9 (S.D. Tex. Mar. 12, 2014). "'[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.'" *DTEX LLC v. BBVA Bancomer, S.A.*, 508 F.3d 785, 794 (5th Cir. 2007) (quoting *Gulf Oil Corp.*, 330 U.S. at

508).

### a.    The Private Factors

In evaluating the private-interest factors, the court considers:

> (i) the relative ease of access to sources of proof; (ii) availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; (iii) possibility of view of [the] premises, if view would be appropriate to the action; (iv) all other practical problems that make trial of a case easy, expeditious and inexpensive . . . enforceability of judgment[; and whether] the plaintiff [has sought to] vex, harass, or oppress the defendant.

*DTEX, LLC*, 508 F.3d at 794 (quoting *Gulf Oil*, 330 U.S. at 508). Each is addressed below.

### i.    Ease of Access to Evidence

The defendants argue that the officers and directors of Rogue, McGarry Bowen UK, and Honda Europe are in the United Kingdom; the remaining witnesses outside the defendants' control are largely in London; and the relevant documents are in London.

The plaintiffs argue that:

- many of witnesses are in New York, not London, making Houston more convenient for receiving their testimony;

- determining the source of the advertisement's portal concept will require testimony from McGarry Bowen US employees and executives like Gordon Bowen;

- even assuming that most relevant documents are located in the United Kingdom, the defendants have not demonstrated that the "documents are so voluminous or difficult to obtain in Houston as to weigh in favor of dismissing the claims" against them, *Tendeka*, 2014 WL 978308, at *10;

- the plaintiffs created *Inversion* in Houston and live and work there.

The plaintiffs also argue that the holding in *Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for the Western Dist. of Texas*, 134 S. Ct. 568, 581 (2013)—that courts should not consider the private-

interest factors in evaluating a motion to transfer venue if the parties' contract includes a valid forum-selection clause—should be extended to intentional torts resulting from a defendant's purposeful reach into the forum state.

The ease of access to evidence weighs slightly in favor of dismissal. As the defendants observe, many (if not most) of the relevant witnesses are in the UK. The following McGarry Bowen UK witnesses are in England: Simon North, the agency's former executive vice president; Remco Graham and Richard Holmes, the creative directors who discovered *Inversion*; Paul Jordan and Angus Macadam, the executive creative directors who developed the pitch; and Alex McNamara and Richard Oakes, the Honda account executives. Apart from McGarry Bowen UK, many other material witnesses not under its control but relevant to the plaintiffs' claims are in London: director Sam Brown; producer Kate Hitchings; independent producer Helen Whiteley; budget consultant David Prys-Owen; and several employees from Honda Europe and The Mill UK. (Docket Entry No. 40, at 16). The court also rejects the plaintiffs' invitation to extend *Atlantic Marine* beyond its facts (a contract dispute involving an enforceable, bargained-for forum-selection clause) to any and every case involving an intentional tort directed at a forum state. That extension would collapse the *forum non conveniens* and personal jurisdiction analyses, which *Atlantic Marine* does not support.

Although the plaintiffs are important fact witnesses, and although Gordon Bowen may also provide relevant testimony, the defendants have shown that this factor weighs slightly in favor of dismissal. The number of critical witnesses in London, as well as the presence of many documents there, tips the balance. *See Glenn v. BP p.l.c.*, — F. Supp. 2d — No. 13-cv-3660, 2014 WL 2765777, at *5 (S.D. Tex. June 18, 2014) ("Most of the relevant evidence concerns the actions of BP's Board; this evidence will be found in England, which *slightly* tips the scale in favor of an

English forum." (emphasis added)).

### ii.    Availability of Compulsory Process

The defendants argue that the UK offers compulsory process over many more material witnesses than does the Southern District of Texas.  They argue that McGarry Bowen UK and the other defendants lack control over critical witnesses whose presence cannot be compelled in Texas but could in London.  In particular, the defendants identify former vice-chairman Simon North, independent producer Helen Whiteley, independent consultant David Prys-Owen, former Honda Europe employee Ellie Tory, former Starcom MediaVest employee David Palmer, and former The Mill UK employees Matthew Williams and Adam Grint.  (Docket Entry No. 29, at 21).

The plaintiffs respond that the defendants have offered no evidence suggesting any of these witnesses would be unwilling to testify voluntarily, and that, if they refuse to come to the United States to testify, depositions could be taken where the witness could be compelled to appear.  The defendants respond that this is unsatisfactory because "fix[ing] the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on deposition is to create a condition not satisfactory to litigants."  *DTEX, LLC*, 508 F.3d at 799 (quoting *Perez & Compania (Cataluna), S.A. v. M/V Mexico I*, 826 F.2d 1449, 1453 (5th Cir. 1987)).  The plaintiffs observe that "only one" of these witnesses—Helen Whiteley—appears to "have been directly involved in the decision to wrongfully copy *Inversion*," and she used a McGarry Bowen email address.  (Docket Entry No. 39, at 9).  The plaintiffs note that this court, but not the London courts, would be able to compel New York residents to appear and testify in Texas.

This factor weighs in favor of dismissal.  Helen Whiteley and several other material witnesses (including Simon North, who has since left McGarry Bowen UK) no longer work for the

defendants and cannot be compelled to testify in Texas.  Because these witnesses live in London, they could be compelled to testify in an English court.  The plaintiffs' suggest this court rely on depositions, but as the Fifth Circuit has noted, that is an unsatisfactory condition.  *See DTEX, LLC*, 508 F.3d at 799.  Moreover, given the court's dismissal of McGarry Bowen US for lack of personal jurisdiction and its location in New York, the court cannot compel its employees to testify.  Although the English courts might be unable to compel attendance of McGarry Bowen US's employees, the company has "expressly agree[d] not to contest personal jurisdiction in the United Kingdom, should this Court dismiss this lawsuit and the Plaintiffs choose to file suit against it there."  (Docket Entry No. 40, at 15).

### iii.    Possibility of Viewing the Premises

As defendants note, *Inversion* no longer exists in tangible form, so there is "no possibility of viewing the work at issue."  (Docket Entry No. 29, at 17).  This factor is neutral.

### iv.    Other Factors

The defendants argue that the practical problems of a trial in Texas weigh in favor of dismissal.  In addition to the absent witness availability and evidence issues, the cost of transporting London-based witnesses to Texas would be "enormous," (Docket Entry No. 29, at 17), and outweighs the burden imposed on the two plaintiffs.  *See DTEX*, 508 F.3d at 801 (rejecting plaintiff's claim of financial hardship based on two American witnesses having to testify in Mexico compared to many Mexican witnesses having to travel to Texas).  They also contend that the plaintiffs would have an easier time enforcing a judgment by a UK court than an American court because the relevant defendants are subject to jurisdiction in the UK (but not Texas).  The plaintiffs respond that they should not have to shoulder the financial burden of suing in the UK when the

36

defendants' tortious conduct that gave rise to this suit.   They note that the expense and inconvenience for the New York witnesses will be lower if the litigation stays in Texas, and that the defendants have not presented evidence that litigating in Texas will be more expensive than in the UK.

This factor is neutral.   One side or the other will likely incur significant expenses and inconvenience depending on where the litigation proceeds.   And enforcing a U.S. judgment against UK companies may be difficult.   But because a "successful motion under *forum non conveniens* requires dismissal of the case" and "inconveniences plaintiffs in several respects," *Atlantic Marine*, 134 S. Ct. 583 n.8 (quoting and altering *Norwood v. Kirkpatrick*, 349 U.S. 29, 32 (1955)), this factor is neutral.

### v.      Summary of the Private-Interest Factors

The plaintiffs' choice of forum is presumptively valid.   Although the defendants have shown that two private-interest factors weigh in favor of dismissing this action, only one of these factors weighs strongly in favor of dismissal.

### b.      The Public-Interest Factors

The public-interest factors include:

> (i) the administrative difficulties flowing from court congestion; (ii) the local interest in having localized controversies resolved at home; (iii) the interest in having the trial of a diversity case in a forum that is familiar with the law that must govern the action; (iv) the avoidance of unnecessary problems in conflict of laws, or in application of foreign law; and (v) the unfairness of burdening citizens in an unrelated forum with jury duty.

*DTEX, LLC*, 508 F.3d at 795 (quoting *Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 342 (5th Cir. 1999)).

### i.       Administrative Difficulties

The defendants largely repeat what they said about witnesses and evidence in arguing that this factor weighs in favor of dismissal.  They also argue that the fact that this court will have to interpret and apply foreign law weighs in favor of dismissal.  The plaintiffs contend that the case involves straightforward application of copyright law, foreign and domestic).  The foreign legal issues presented in this case are not particularly complex or novel.  The reasons discussed above on the availability of the evidence, particularly witnesses, make this factor weigh slightly in favor of dismissal.

### ii.       The Forum's Interest in Resolving the Controversy

Texas has an interest in this dispute.  The plaintiffs are Texas residents who created and hold copyrighted intellectual property in Texas.  The plaintiffs also allege that the defendants violated Texas state law in fraudulently inducing Ruck's consent through Hitchings's deceptive phone call and emails and the defendants' knowing use of the results.  The defendants argue that the UK has a stronger interest in resolving this controversy because the alleged infringement occurred in London, not the U.S., making UK copyright law apply under the Berne Convention.  *See* NIMMER ON COPYRIGHT § 17.05[A] (2013) (stating that the Berne Convention does not make U.S. law applicable overseas, but rather, provides that signatories' citizens are "entitled to the same copyright protection in each other member state as such other state accords its own nationals"); *Rundquist v. Vapiano*, 798 F. Supp. 2d 102, 126 (D.D.C. 2011) ("[A]cts of infringement occurring outside the United States are not actionable under the Copyright Act because U.S. copyright law has no extraterritorial effect.").

The plaintiffs respond that the UK's interest is irrelevant to determining whether Texas has

an interest in resolving the controversy.  They also contend that when a foreign defendant "poaches" a plaintiff's intellectual property from the United States, the public factors weigh strongly against dismissal.

The United States undoubtedly has a strong interest in protecting its citizens' intellectual property from foreign "poaching."  But the "poaching" cases carry less weight when, as here, the vast majority (if not all) of the infringing activity occurred in a foreign jurisdiction where the courts and law protect the intellectual-property holder.  In *World Film Services, Inc. v. RAI Radiotelevisione Italiana S.p.A.*, for example, the "allegedly infringing work [was] claimed to have been distributed in the United States generally, and specifically in New York."  1999 WL 47206, at *9 (S.D.N.Y. Feb. 3, 1999).  Similarly, in *Hayes Bicycle Group, Inc. v. Muchachos International Co.*, federal trademark law applied to the plaintiff's claims because the defendant "marketed itself within the United States" and its "representatives visited Hayes's [Wisconsin] headquarters during contract negotiations."  2008 WL 4830570, at *5 (E.D. Wis. Oct. 31, 2008).  In *CYBERsitter, LLC v. People's Republic of China*, the plaintiff based "four of its seven claims on California and federal law whereas only one claim [was] based on the law of China."  2010 WL 4909958, at *8 (C.D. Cal. Nov. 18, 2010).  Finally, in *International Dictionary Series*, while the court recognized that the "United States . . . has an interest in the protection of its certificate of registration for copyright," it further observed that:

> the unrefuted evidence submitted to the Court substantiates that a United States copyright would be given protection in Australia, since both parties are signatories to the Berne Convention.

822 F. Supp. at 680-81.

The court concludes that both Texas and the United States have an interest in litigating this

matter in a Texas federal court, but that interest is somewhat diminished by the extraterritorial focus of the alleged infringing activity and the effective availability there of legal remedies and courts willing to enforce them.  This factor weighs only slightly against dismissal.

### iii.    The Governing Law

The parties dispute the law that applies.  Both agree that UK copyright law applies to the alleged infringing actions and distribution in London.  *See Rundquist v. Vapiano*, 798 F. Supp. 2d 102, 126 (D.D.C. 2011) ("[A]cts of infringement occurring outside the United States are not actionable under the Copyright Act because U.S. copyright law has no extraterritorial effect.").  The plaintiffs assert that U.S. law applies as well because the alleged contributory infringement includes the defendants' actions in making their copyrighted material available on websites for infringing use in the United States.  The defendants argue that the plaintiffs' allegations of contributory infringement under U.S. law are insufficient to state a claim, and in any event, UK copyright law will predominate because the alleged infringing activity largely occurred in London.  They assert a "strong interest in trying [this] case in a forum that is familiar" with that law.  *Zermeno v. McDonnell Douglas Corp.*, 246 F. Supp. 2d 646, 664 (S.D. Tex. 2003).

Although the plaintiffs' allegations of the infringing distribution in London would require the court to apply UK copyright law, their allegations of contributory infringement involving the United States implicate that country's law as well.  "A defendant in an infringement action may be held liable for acts of infringement if that defendant is either contributorily or vicariously liable for another's direct act of infringement.  Where those acts of infringement occur within the United States and a plaintiff seeks to hold a foreign defendant contributorily or vicariously liable for those acts, it has been held that subject matter jurisdiction may exist, and that the exercise thereof does

not conflict with the doctrine of nonextraterritoriality." *Armstrong v. Virgin Records, Ltd.*, 91 F. Supp. 2d 628, 635 (S.D.N.Y. 2000).

"One infringes contributorily by intentionally inducing or encouraging direct infringement, and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) (citations omitted).   "A party is liable for contributory infringement when it, 'with knowledge of the infringing activity, induces, causes or materially contributes to infringing conduct of another.'" *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 790 (5th Cir. 1999) (quoting *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)); *accord Papa Berg, Inc. v. World Wrestling Entertainment, Inc.*, No. 3:12-cv-2406-B, 2013 WL 6159296, at *12 (N.D. Tex. Nov. 23, 2013).

The plaintiffs' allegations establish that the remaining defendants uploaded the video, with knowledge of its potential for infringing use, to several websites available in the United States, including Vimeo and www.mcgarrybowen.com.  The record raises a plausible inference that McGarry Bowen US has engaged in some infringing behavior in the United States. *See Rundquist*, 798 F. Supp. 2d at 127 ("At least one act by the alleged infringer or by the third-party must take place in the United States to trigger the protection of United States law and the subject matter jurisdiction of this Court.").  This is sufficient at this stage for an inference that the defendants "induced, caused, or materially contributed to the infringing conduct" of McGarry Bowen US in the United States. *Alcatel*, 166 F.3d at 790; *Rundquist*, 798 F. Supp. 2d at 126.

Finally, the plaintiffs allege a plausible state-law claim for fraud based on the defendants' communications with Ruck to elicit his consent.

41

Because the plaintiffs alleged state-law fraud and contributory infringement under U.S. law,[16] and the UK the copyright claim is not novel or unduly complex, this factor is neutral.

### iv.     The Burden on Citizens

This lawsuit involves plaintiffs who created copyrighted material in Texas, continue to hold that copyright in Texas, and live and work in Texas.  Litigating their claims— under both UK and U.S. copyright law, as well as state law—will not unfairly burden Texas residents serving as jurors. *See id.* at 803.  The defendants' argument that trying this case in Texas will force Texas jurors to determine "whether UK companies violated UK law," (Docket Entry No. 29, at 21), fails to recognize that the intellectual property and its owners have strong connections to Texas.  This factor weighs against dismissal.

### v.     Summary of the Public-Interest Factors

The defendants have not shown that the public-interest factors weigh strongly in favor of dismissing the plaintiffs' copyright and state-law claims against them in Texas to permit litigation in the United Kingdom.

### C.     Conclusion as to *Forum Non Conveniens*

Although the defendants have met their burden to show the existence of an available and adequate alternative forum, they have not demonstrated that the private and public factors strongly weigh in favor of dismissal.  The record does not support the "'hars[h] result'" of dismissing the entire case and forcing the plaintiffs to litigate in England, "inconvenienc[ing] [them] in several respects," *Atlantic Marine*, 134 S. Ct. 583 n.8 (quotations omitted).  The motion to dismiss based

---

[16] Even if only UK copyright law applies, that factor "standing alone . . . does not justify dismissal," *Rundquist*, 798 F. Supp. 2d at 132 (quotation omitted).

on *forum non conveniens* is denied.

**VI.      Conclusion**

The defendants' motion to dismiss for lack of personal jurisdiction (Docket Entry No. 28) is granted in part and denied in part.  The court grants the motion as to McGarry Bowen US, The Mill UK, and Honda Europe, and denies the motion as to Rogue Films and McGarry Bowen UK. The remaining defendants' motion for *forum non conveniens*, (Docket Entry No. 29), is denied.  An order of dismissal as to McGarry Bowen US, The Mill UK, and Honda Europe is separately entered.

SIGNED on September 30, 2014, at Houston, Texas.

Lee H. Rosenthal
United States District Judge